IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

TONIA U.,[1]

    Plaintiff,

v.

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,

    Defendant.

Case No. 3:21-CV-1202-NJR

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

    Plaintiff Tonia U. ("Plaintiff") appeals to the district court from a final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB"). For the following reasons, the Commissioner's decision is affirmed.

### PROCEDURAL HISTORY

    Plaintiff applied for DIB in September 2019, alleging disability beginning in October 2015 after a car accident. (Tr. 137-38.) The application initially was denied on January 24, 2020 (Tr. 104-06), and it was denied upon reconsideration on August 17, 2020 (Tr. 115-16). Plaintiff timely requested a hearing, and a hearing was held before Administrative Law Judge Gerald Meyr ("ALJ") on February 18, 2021. (Tr. 10-31.) On April 23, 2021, the ALJ issued an unfavorable decision, finding Plaintiff was not disabled prior to her date last insured of June 30, 2018. (Tr. 13-26.) The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1.)

    Plaintiff now appeals the denial of DIB directly to this Court. Plaintiff raises three issues:

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

(1) whether the ALJ erred by establishing a residual functional capacity ("RFC") that failed to incorporate limitations expressly found by the ALJ; (2) whether the ALJ failed to develop the record by failing to solicit medical opinion evidence; and (3) whether the ALJ erred by not explaining the basis for the RFC as required by SSR 96-8p. (Doc. 16). The Commissioner timely filed a brief in opposition. (Doc. 22).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "more than a mere scintilla, and means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, it makes it impossible for a district court to assess whether the ruling rested on substantial evidence and requires the court to remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

## LEGAL STANDARD

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if he has an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). "A claimant need not be disabled at the date of his hearing; rather, he qualifies for benefits if a disability existed for any consecutive twelve-month period during the relevant time frame." *Mara S. on behalf of C.S. v. Kijakazi*, No. 19-CV-8015, 2022 WL 4329033, at *8 (N.D. Ill. Sept. 19, 2022) (citing 20 C.F.R. § 404.320(b)(3)).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth five questions for the ALJ to consider in assessing whether a claimant is disabled: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment enumerated in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's residual functional capacity leave him unable to perform his past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy? *See* 20 C.F.R. § 404.1520; *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022).

An affirmative answer at either step three or step five leads to a finding that the claimant is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The claimant bears the burden of proof at steps one through four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national

economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

## EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**I.      Relevant Medical Records**

On October 12, 2015, Plaintiff was in a roll-over motor vehicle accident that lacerated her spleen. (Tr. 1209.) Plaintiff had surgery to repair her spleen and spent two days in the hospital. (*Id.*) A CT scan of her cervical spine showed no acute injury or fracture, mild degenerative disc disease at C5-C6, mild reversal of cervical lordosis, and no cervical disc herniation or significant disc bulging. (Tr. 465.)

Plaintiff followed up with her primary care physician, Dr. James Ricci, on November 13, 2015, as she was still having pain. (Tr. 638, 699.) On physical examination, she had no masses, no edema, and she had full range of motion. (Tr. 638.) Her muscle strength was 5/5. (*Id.*) The doctor increased her Vicodin prescription to one to two pills four times a day per Plaintiff's request. (*Id.*) On November 19, 2015, Plaintiff returned to Dr. Ricci as she was concerned he could still be hemorrhaging from her spleen. (Tr. 634.) A CT scan showed no acute issues. (*Id.*) A second CT scan on November 24, 2015, showed probable areas of infarction and cystic change were present in her spleen. (Tr. 699.) By the end of December 2015, the abdominal pain seemed to be gradually fading. (Tr. 630.)

On December 5, 2015, Plaintiff went to the ER after she tripped on some stairs at home, fell, and twisted her right ankle. (Tr. 431.) Plaintiff also reported fainting spells. (*Id.*) Plaintiff was diagnosed with a sprained ankle and syncope (fainting). (*Id.*)

In May 2016, Plaintiff saw a physician's assistant at Dr. Ricci's office for complaints of mid

back pain and spasms. (Tr. 625.) She requested a refill of Norco and something to help the spasms. (*Id.*) Plaintiff was given Flexeril, and her Norco was refilled. (*Id.*)

Plaintiff saw the physician's assistant again on September 8, 2016, for epigastric discomfort. (Tr. 617.) Plaintiff was noted to have a "questionable history of ulcerative colitis which was disproved and found to be irritable bowel." (*Id.*) She had been nauseated and not eating very much. (*Id.*) Further testing was ordered, and Plaintiff was instructed to maintain a bland diet. (*Id.*). Plaintiff inquired about amitriptyline as it previously worked for her irritable bowel. (*Id.*) The PA thought it might also help with her chronic pain, so Plaintiff was prescribed 25 mg to take nightly. (*Id.*)

At a follow-up with Dr. Ricci on November 24, 2016, Plaintiff's symptoms were noted to be consistent with irritable bowel syndrome/diarrhea. (Tr. 609.) Plaintiff also was noted to have chronic pain and chronic anxiety. (*Id.*) Plaintiff's prescriptions, including Xanax, Norco, and Ambien, were refilled. (*Id.*)

In December 2016, Plaintiff was admitted to the hospital after she had increased confusion and was sleeping excessively. (Tr. 240.) The confusion was found to be secondary to sepsis related to a urinary tract infection. (Tr. 243.)

In March 2017, Plaintiff saw Dr. Ricci for lower back pain. (Tr. 692.) An examination of the lumbar spine revealed degenerative changes of the lumbar facet joints, a lumbarized S1 vertebral body, and bilateral pseudoarthrosis. (*Id.*) Plaintiff had an MRI of her lumbar spine, which showed minimal to mild disc bulging at L4-5 and L5-S1, mild disc protrusion posterolaterally on the left at L4-5, with mild encroachment upon the left neural foramen, and mild to moderate facet osteoarthritis, most prominent at L5-S1 and L4-5. (Tr. 691.)

In June 2017, Plaintiff saw Dr. Ricci for a well visit. She was observed to have good health except for anxiety disorder and depression. (Tr. 574.) Plaintiff was noted to take Prozac 20 mg

and Xanax three times a day. (*Id.*) Two months later, Plaintiff returned to Dr. Ricci after an ER visit. Plaintiff reported taking too much Tramadol, too much Lyrica, and too much Xanax, so she stopped taking her medication. (Tr. 572.) Dr. Ricci planned to keep her on Prozac and increase it to 40 mg daily if needed, but take her off all other medications other than Prevacid for reflux until her husband could "control her medications." (*Id.*)

Plaintiff saw Dr. Barry Mossman on August 18, 2017, for anxiety. (Tr. 571.) She had stopped all of her medications a few weeks before and was hoping for refills of Xanax. (*Id.*) Dr. Mossman restarted Plaintiff on BuSpar and recommended that she follow up at Centerstone. (*Id.*)

A month later, Plaintiff returned to Dr. Ricci for depression and anxiety. (Tr. 569.) The BuSpar was ineffective so she quit taking it. (*Id.*) Dr. Ricci increased her Prozac to 60 mg daily and prescribed Xanax at .25 mg daily up to three times a day. (*Id.*)

On October 30, 2017, Plaintiff went to the ER after she tripped in a pothole and fell to the ground, catching herself with her left arm. (Tr. 322.) Plaintiff was diagnosed with a left radial head fracture and walking pneumonia. (Tr. 326.) At a follow-up appointment with a nurse practitioner on November 8, 2017, Plaintiff asked for her Xanax to be increased due to increased anxiety. She stated that she had to cancel her appointment with a psychiatrist, and she could not be seen until December. (*Id.*) The nurse looked up her Illinois controlled substance log, which showed that, since September 3, 2017, Plaintiff had picked up 180 tablets of .25 mg Xanax, 180 tablets of .5 mg Xanax, 90 tablets of 1 mg Xanax. The nurse reviewed the list with Dr. Ricci, who requested that all Xanax prescriptions be discontinued. (Tr. 566.)

Plaintiff next saw Dr. Mark Napier for anxiety and depression. (Tr. 803.) Plaintiff reported abuse as a child, as well as several recent deaths in her family and friends. (*Id.*) She also stated that she is depressed and anxious, she has trouble concentrating on tasks, and she has very poor sleep. (*Id.*) Dr. Napier started Plaintiff on Cymbalta for anxiety and depression, continued Xanax,

and started Lunesta for insomnia. (Tr. 804.)

Plaintiff called Dr. Napier's office on January 16, 2018, stating that the Xanax was not helping her anxiety. (Tr. 806.) She wanted to try Klonopin, which was prescribed for her. (*Id.*). Plaintiff reported feeling worse on Klonopin (clonazepam) and continued PTSD symptoms. (*Id.*) Dr. Napier switched Plaintiff to Seroquel 25 mg three times a day in addition to Xanax and Cymbalta. (*Id.*) On January 31, 2018, Plaintiff requested an increase in her Seroquel to four times per day, which Dr. Napier approved. (Tr. 809.)

On February 20, 2018, Plaintiff visited Mid-West Podiatry for complaints of left foot pain. (Tr. 1173.) Plaintiff was diagnosed with hallux valgus—a bunion—and surgery was scheduled for February 27, 2018. (Tr. 1174.) Post-surgery, Plaintiff healed appropriately. (Tr. 1175-84.)

By March 27, 2018, Plaintiff reported to Dr. Napier that her mood state had improved, she felt calmer through the day, and she felt more hopeful about the future. (Tr. 812.)

## II.     State Agency Examiners

At the initial disability determination level, Lenore Gonzales, M.D., reviewed Plaintiff's medical records, while Howard Tin, Psy.D., reviewed Plaintiff's psychiatric records. (Tr. 85-86.) Both doctors found insufficient evidence to evaluate Plaintiff's claims. (*Id.*). On reconsideration, Ranga Reddy, M.D., and M.W. DiFonso, Psy.D., and made the same findings. (Tr. 95-96.)

## III.    Evidentiary Hearing

Plaintiff appeared via telephone and was represented by counsel at the hearing on February 18, 2021. (Tr. 34-75.) Vocational expert Darrell Taylor also testified by telephone. (*Id.*)

Plaintiff testified that she was involved in a motor vehicle accident on October 12, 2015, which rendered her unconscious for two days. (Tr. 48.) Plaintiff suffered a lacerated spleen, which required surgery, as well as a concussion, deep bone bruising, back pain, and neck pain. (Tr. 49.) Plaintiff has no memory of the accident. (*Id.*)

Prior to her accident, Plaintiff worked as a licensed paramedic for more than 20 years and as a pharmacy technician for 15 years. (Tr. 46.) She had been diagnosed with Crohn's disease or IBS and, before the accident, had diarrhea about five times a day. (Tr. 51.) She was able to manage the condition, however, through medication and Imodium, which allowed her to work. (*Id.*). After her accident, her condition worsened in that her diarrhea became more frequent and more severe. (*Id.*). Plaintiff stated that she had diarrhea upwards of 10 times per day, and medications were not really helpful. (Tr. 51.)

The ALJ noted that Plaintiff had scoliosis her whole life, and Plaintiff testified that after the accident her back pain was much worse. (Tr. 52.) She stated that she could no longer do a lot of lifting, bending down, squatting kneeling, or turning her head to the left or right. (Tr. 52-53.) She further testified that, in the relevant period, her pain and range of motion never improved. (Tr. 53.) According to Plaintiff, she could lift only 10 pounds without straining herself. (Tr. 54.) She could no longer carry groceries or her grandchildren, and she could not lift cement blocks for landscaping. (*Id.*)

As to Plaintiff's mental health, she testified that after the accident her short term memory was extremely poor. (Tr. 55.) She also suffered from anxiety and couldn't ride in a car or drive a car. (*Id.*) She began to feel depressed, as there was nothing she felt she could do. (*Id.*) There were times when she couldn't get out of bed and cried for days. (*Id.*) She couldn't focus or complete a task. (*Id.*) She began seeing a counselor who prescribed Celexa, but the antidepressant caused her chest pain and shortness of breath. (Tr. 56.) She tried multiple other drugs until she found relief from Zoloft. (*Id.*)

Plaintiff testified that in June 2016 she went back to work as an EMS dispatcher to help take her mind off of her depression and to get back to her normal life. (Tr. 57.) She held that job in a probationary capacity for two months, but her performance was not what it should have

been. (Tr. 44.) Plaintiff explained that her brain was not communicating correctly with the rest of her hands and the rest of her body when working on the computer. (Tr. 58.)

Plaintiff also needed help remembering doctor appointments, to take her medication, and to shower and change clothes. (Tr. 58-59.) She had trouble completing tasks around the house such as laundry and dishes. (Tr. 59.) Plaintiff would start a task but then forget what she was doing. (*Id.*)

Plaintiff was then questioned by her attorney, who asked Plaintiff about her foot pain. (Tr. 60.) Plaintiff testified that she had surgery on her right foot. (*Id.*) After the accident, Plaintiff can no longer stand for more than 15 minutes or walk more than two blocks without taking a break. (Tr. 61.) If she needed to walk a longer distance, she used crutches or a walker. (*Id.*) Finally, after the accident, Plaintiff could no longer do yard work or keep up with her fishpond. (Tr. 62.) She also isolated herself from her friends and no longer socialized. (*Id.*)

In his first hypothetical, the ALJ asked the vocational expert, Darrell Taylor, to assume an individual who can perform light work, except that she could never climb ladders, rope, and scaffolds and occasionally climb ramps and stairs; could occasionally stoop, crouch, kneel, and crawl; could not use hazardous machinery or be exposed to unshielded moving mechanical parts, unprotected heights, or extreme vibrations; could not drive motor vehicles as part of the work function; was limited to remembering, understanding, and carrying out simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs with no strict production quotas, with an emphasis on a per shift rather than a per hour basis; should involve only simple, work-related decisions with few, if any, workplace changes; and occasional interaction with the general public, co-workers, and supervisors. (Tr. 68-69.) With those limitations, the vocational expert testified that the individual could not perform Plaintiff's past relevant work. (Tr. 69.) However, such an individual could perform an unskilled cleaner position, an unskilled hand

packer position, or an unskilled production worker.

In his second hypothetical, the ALJ asked the vocational expert to assume the same limitations except that the individual can occasionally climb ramps or stairs and occasionally stoop, crouch, kneel, and crawl. (Tr. 69-70.) The vocational expert testified that his testimony would not change despite the additional abilities. (Tr. 70.)

For his third hypothetical, the ALJ asked the vocational expert to assume an individual of Plaintiff's age, education, and work experience who would be able to perform sedentary work in addition to the limitations in hypothetical number 2. (*Id.*) The vocational expert testified that there are approximately 22,000 sedentary hand packer positions nationally, 25,000 sedentary production worker positions nationally, and 12,000 sedentary inspector, tester, sorter positions nationally. (Tr. 71.)

If, however, the individual had to have their work instructions and tasks, as well as their work product reviewed by a supervisor frequently during the workday, then these positions would be precluded. (*Id.*) Likewise, if the individual had two or more unexcused absences per month, if the individual would be off task 15 percent or more of the workday due to the combination of impairments, or if the individual needed to be redirected on tasks at least six times per day, then the individual would soon be terminated and no such jobs would be available. (Tr. 72-73.)

## DECISION OF THE ALJ

In reaching his decision, the ALJ considered hearing testimony from Plaintiff and the impartial vocational expert, as well as Plaintiff's medical records.

At step one, the ALJ concluded Plaintiff did not engage in substantial gainful activity during from her alleged onset date of October 12, 2015, through her date last insured of June 30, 2018. (Tr. 16).

At step two, the ALJ concluded that Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine, scoliosis, PTSD, anxiety disorder, depressive disorder, Crohn's disease, irritable bowel syndrome, and left foot dysfunction, which significantly limit the ability to perform basic work activities. (*Id.*)

At step three, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in the regulations. (Tr. 17.)

At step four, the ALJ determined that, through the date last insured, Plaintiff had the RFC to perform light work, except she could never climb ladders, rope, and scaffolds and occasionally climb ramps and stairs. (Tr. 19.) She could occasionally stoop, crouch, kneel, and crawl. (*Id.*) Plaintiff also could not use hazardous machinery or be exposed to unshielded moving mechanical parts, unprotected heights, or extreme vibrations, and could not drive a motor vehicles as part of the work function. The ALJ also found Plaintiff was limited to remembering, understanding, and carrying out simple and routine instructions and tasks consistent with SVP levels 1 and 2 type jobs with no strict production quotas, with an emphasis on a per shift rather than a per hour basis. (*Id.*) The jobs should involve only simple, work-related decisions with few, if any, workplace changes; and occasional interaction with the general public, co-workers, and supervisors. (*Id.*)

In coming to this conclusion, the ALJ considered Plaintiff's past history of Crohn's disease, the laceration to her spleen requiring surgical repair, her sprained right ankle and fractured left arm, her low back pain and left foot pain, and her bunion surgery, which was completed without complication. (Tr. 23.) The ALJ found that the evidence did not support a finding of Crohn's disease or irritable bowel syndrome symptoms of a frequency and severity to prevent the claimant from sustaining a normal work schedule (8 hour a day, 40 hours a week) on a regular and continuing basis. (*Id.*) Further, Plaintiff's back pain was treated with Tramadol, non-steroidal

anti-inflammatory drugs, and chiropractic adjustments with unremarkable physical examination findings. (*Id.*) Lastly, Plaintiff's right ankle sprain, left arm fracture, and left foot bunion surgery were short-term impairments that did not impose symptoms or limitations for a period of at least 12 consecutive months. (*Id.*) Nevertheless, the ALJ found these impairments required a reduction of her RFC, as they imposed physical exertional limitations that prevented her from sustaining medium or greater work, with limited ability to climb or bend and merited precautionary limitations of avoiding excessive vibration or hazards. (*Id.*)

The ALJ was not persuaded by the findings of the state agency physicians, Dr. Gonzalez and Dr. Reddy, and the state agency psychologists, Dr. Tin and Dr. DiFonso, who determined there was insufficient evidence prior to Plaintiff's date last insured to evaluate her condition. (*Id.*) This is because evidence submitted after these assessments justified the ALJ's conclusion that Plaintiff had impairments with symptoms and limitations consistent with the RFC to perform light work. (*Id.*)

With regard to Plaintiff's mental impairments, the ALJ noted that the condition of Plaintiff's mental status during the period of alleged disability had not deteriorated to such an extent that she needed inpatient psychiatric hospitalization. (Tr. 24.) Plaintiff sought formal mental health treatment, and her PTSD, anxiety, and depression were treated, stable, and generally controlled with compliant prescribed psychotropic medication therapy. (*Id.*) The objective data, more often than not, showed Plaintiff to have only minimally abnormal mental status examination findings. (*Id.*) In sum, the ALJ found Plaintiff's allegations of disabling mental impairments were not supported by the clinical findings. (*Id.*) Rather, the ALJ found they imposed only moderate limitations as to Plaintiff's capacity to understand, remember, carry out detailed and complex instructions, and interact with others. (*Id.*) The ALJ concluded that Plaintiff can concentrate, persist, and maintain pace sufficiently to sustain the performance of simple,

routine tasks with no strict production quotas and make simple work-related decisions with few, if any, workplace changes. (*Id.*)

In conclusion, when considering Plaintiff's physical and mental impairments, the ALJ found that the objective medical evidence supported a finding that Plaintiff's impairments precluded her from performing more than light exertional level work activity with non-exertional postural and environmental limitations. (*Id.*) As a result, through the date last insured, Plaintiff was unable to perform her past relevant work as a paramedic, which is a skilled, very heavy exertional level occupation and well in excess of her RFC. (*Id.*)

At step five, the ALJ found that, though the date last insured, when considering Plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could have performed. (Tr. 25.) The ALJ was persuaded by the testimony of the vocational expert, who stated that a claimant with Plaintiff's age, education, work experience, and RFC could perform occupations such as a cleaner, a hand packer, or a production worker. (*Id.*) Thus, Plaintiff was able to make a successful adjustment to other work that existed in significant numbers in the national economy, and a finding of "not disabled" was appropriate. (*Id.*)

## DISCUSSION

### I.  The ALJ Did Not Produce an Erroneous RFC

Plaintiff first argues that the ALJ's assessment of her RFC is not supported by substantial evidence. Specifically, Plaintiff argues that the ALJ found Plaintiff's mental impairments caused moderate difficulties in her ability to understand, remember, or apply information, interact with others, and maintain concentration, persistence, or pace. (Tr. 18.) In determining her RFC, however, the ALJ did not account for her moderate limitations in maintaining concentration, persistence, or pace, and did not ask the vocational expert to consider those limitation—despite

accounting for her other moderate limitations.

In response, the Commissioner argues that Plaintiff has not pointed to any objective evidence demonstrating that she could not perform work with the assessed restrictions. Furthermore, the ALJ specifically provided for Plaintiff's fair abilities to concentrate, persist, and maintain pace by limiting her to "simple, routine tasks with no strict production quotas and . . . simple work-related decisions with few, [if] any, workplace changes." (Tr. 24.) Thus, the evidence supports the ALJ's assessment of Plaintiff's abilities with regard to concentration, persistence, and pace.

The Court agrees with the Commissioner that the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence. The ALJ stated:

> With regard to concentrating, persisting, or maintaining pace, the claimant had a moderate limitation. The claimant alleged depression and anxiety with difficulty with memory, attention, and concentration. The claimant complained of depressed mood, decreased energy, and difficulty focusing on tasks. However, mental status examinations reveal intact memory, attention, and concentration, as discussed in more detail below. The claimant had the capacity to maintain the attention and concentration to sustain simple work that did not require strict production quotas with an emphasis on a per shift rather than a per hour basis and involving only simple, work-related decision with few, if any, workplace changes. (Tr. 18.)

He then further explains:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment of the areas of mental functioning. (Tr. 19.)

In performing that more detailed assessment, the ALJ referred to Plaintiff's medical records. On December 14, 2017, Plaintiff was examined by the psychiatrist, Dr. Napier, who noted Plaintiff was fully oriented with no evidence of thought disorder with normal memory and intact attention, insight, and judgment. (Tr. 21.) In February 2018, Plaintiff reported difficult focusing

on tasks, but her mental status examination was unremarkable. (Tr. 22.) In sum, the ALJ noted that the clinical observations of Plaintiff's mental functioning showed she was fully oriented with no evidence of thought disorder with intact memory, attention, insight, and judgment. (Tr. 24.) Accordingly, the ALJ concluded that Plaintiff's mental impairments impose moderate symptoms and limitations "with her capacity to understand, remember, and carry out detailed and complex instructions only." (*Id.*) Importantly, the ALJ found that Plaintiff can "**concentrate, persist, and maintain pace sufficiently to sustain the performance of simple, routine tasks with no strict production quotas and make simple work-related decisions with few, in any, workplace changes**." (*Id.*)

Plaintiff directs the Court to *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019), in which the Seventh Circuit found that the ALJ erred by not including the plaintiff's "moderate" limitations in concentration, persistence, and pace in the hypothetical question to the vocational expert. In that case, however, there was objective evidence from two doctors as to the plaintiff's moderate limitations in these areas. *Id.* Here, Plaintiff has pointed to no such evidence, and the ALJ accurately noted that there was no objective evidence of Plaintiff's inability to concentrate, persist, or maintain pace. Indeed, as argued by the Commissioner, no treating mental health professional observed any functional deficiencies caused by Plaintiff's alleged mental impairments. Accordingly, the ALJ's assessment of Plaintiff's RFC is supported by substantial evidence.

**II.     The ALJ Appropriate Developed the Record**

Plaintiff next argues that the ALJ erred in failing to develop the record. Plaintiff claims the ALJ created the RFC without relying on any medical opinions, considering the state agency physicians were unable to consider and evaluate Plaintiff's impairments and limitations due to insufficient evidence. Plaintiff contends that records she obtained subsequent to the hearing

should have been provided to the physicians for their review and consideration. The ALJ's failure to provide these records to the physicians and seek their medical opinions before determining Plaintiff's RFC was error.

In response, the Commissioner argues that the lack of a medical opinion is not, on its own, grounds for remand. The Commissioner asserts the regulations provide specifically that it is the ALJ's responsibility to assess a claimant's RFC, and the Seventh Circuit has clarified that an ALJ is free to do so with or without a medical opinion, citing 20 C.F.R. § 404.1546(c) and *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide."). Additionally, the Commissioner avers, the regulations give the ALJ discretion to decide whether additional medical review of evidence is necessary; an ALJ need only seek additional review if the evidence is inadequate to allow the ALJ to reach a conclusion. In this case, the Commissioner argues, the ALJ did not need to seek review of the additional medical records because the evidence did not support Plaintiff's allegations. Specifically, she argues, the records submitted by Plaintiff after the hearing would not have affected the outcome at all.

The records submitted by Plaintiff post-hearing consist of Exhibits B15F-B17F. (Doc. Tr. 835-1044). Exhibit B15F are records of Plaintiff's bunion surgery at Mid-West Podiatry. Plaintiff presented to Mid-West Podiatry in February 2017 for complaints of left foot pain. (Tr. 1173.) Plaintiff was diagnosed with hallux valgus—a bunion—and surgery was scheduled for February 27, 2018. (Tr. 1174.) Post-surgery, Plaintiff healed appropriately. (Tr. 1175-84.) Exhibit B16F is a mental health assessment from Centerstone. (Tr. 1189.) Plaintiff sought services due to an increase in her anxiety and depression after going off her medication for three weeks. (*Id.*) Plaintiff's symptoms, including periods of sadness, irritability, worry, lack of concentration, racing thoughts, and inability to sleep met the criteria for generalized anxiety disorder. (Tr. 1190.) B17F

consists of records from immediately after Plaintiff's car accident in October 2015, including her spleen surgery and her hospital discharge summary. (Tr. 1203-18.)

The Court agrees with the Commissioner that the ALJ did not err in failing to submit these records to the state agency examiners for further review. "[T]e completeness of an administrative record is generally committed to the ALJ's discretion." *Thomas*, 745 F.3d 802, at 808; *see also Ziegler v. Saul*, No. 19-CV-391-WMC, 2020 WL 2300310, at *9 (W.D. Wis. May 8, 2020) ("[T]o the extent that plaintiff suggests that ALJ is always required to solicit a medical opinion in order to translate medical evidence into an RFC finding, she is simply mistaken."). The ALJ was not required to obtain further medical opinions from the state agency examiners, and nothing in the later submitted records would have changed the outcome here.

Of course, an ALJ cannot "play doctor" by substituting his own medical opinion for that of a physician. *See Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("[A]n ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). But that is not what occurred here. The later-submitted records simply confirmed that Plaintiff had surgery for her ruptured spleen, she had surgery on her foot, and she had one additional mental health assessment where she was diagnosed with general anxiety disorder. Because the later-submitted evidence would not have changed the RFC assessment, the Court finds that the ALJ did not err in failing to obtain additional medical opinions from the state agency examiners.

### III.     The ALJ Thoroughly Explained the RFC Assessment

Plaintiff finally asserts the ALJ summarily formed the RFC without explanation consistent with SSR 96-8p. Plaintiff claims the ALJ simply recited the medical record evidence, then summarily reached the RFC without providing any explanation as to why Plaintiff was somewhat limited in her work capabilities but not fully disabled.

The Court is unpersuaded by this argument to the point of finding it disingenuous.

Plaintiff argues that under SSR 96-8p, when formulating an RFC, the ALJ must (1) include a narrative discussion of how the evidence supports each conclusion and cite specific medical facts and non-medical evidence; (2) assess the individual's ability to perform sustained work activities in a work setting on a regular and continuing basis; and (3) describe the maximum amount of each activity the person can perform. SSR 96-8p. That is exactly what the ALJ did here. The ALJ meticulously discussed Plaintiff's medical record evidence and her hearing testimony, and he determined she was unable to perform medium or greater work. Instead, the ALJ found that Plaintiff has impairments that impose symptoms and limitations that preclude her from performing more than light exertional level work activity with non-exertional postural and environmental limitations. As argued by the Commissioner, the ALJ "more than satisfied his responsibility to articulate his findings."

## Conclusion

For these reasons, the Commissioner's final decision denying Plaintiff's application for social security disability benefits is **AFFIRMED**, and this action is **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment in favor of the Commissioner of Social Security.

**IT IS SO ORDERED.**

DATED: March 31, 2023

*[signature]*

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**